**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **RALPH MICHAEL KARAU,** | : | **Criminal No. 22-033 (CRC)** |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following Memorandum in Aid of Sentencing which supports its request and recommendation that for Count One, Misuse of Names, Words, Emblems, or Insignia, in violation of 18 U.S.C. § 712, the Defendant be sentenced to a period of a 12-month period of unsupervised probation. The Defendant, a senior official within the U.S. Department of Homeland Security ("DHS") at the time of the offense, abused his public office, using government-furnished equipment to settle a personal dispute he had. In doing so, he managed to cause a minor diplomatic incident, given that the targets of his abuse were French nationals, embarrass his employer, and engender a significant amount of anxiety on the part of the victims in this matter. For his conduct, the Defendant has already paid a heavy price – including the loss of his long-time position at DHS, the loss of a position with a private contractor upon entering a guilty plea in this case, as well as the loss of Top Secret / Special Compartmentalized Intelligence ("TS/SCI") security clearance which will limit future employment opportunities. In light of the significant consequences he has already faced and pursuant to the parties' plea agreement, the government is asking for a period of unsupervised probation.

I.    **Background**

Despite having worked for the federal government for three decades, having access to some of the most sensitive classified information available, and being compensated at levels in the upper echelon of the government pay scale, Defendant Karau chose to end his career in government by using his government laptop to create a fraudulent letter using official government seals seeking to intimidate a pair of French nationals whom he believed had wronged his family.

Defendant Karau had a long, and by all accounts distinguished, career within the federal government that renders his conduct in the instant offense all the more inexplicable.  Prior to arriving at DHS in 2009, Defendant Karau had served as a Senior Program Manager at the U.S. Department of Treasury (1998 to 2009), Director of Program Development at the U.S. General Services Administration (1996 to 1998), and Specialist at GSA (1987 to 1996). PSI at ¶59.  In 2009, Defendant Karau moved to DHS, where he began as a Senior Asset Manager in 2009 by the Office of the Chief Administrative Officer, prior to becoming the Director of Real Property for the agency.  As part of this senior position, Defendant Karau was, along with his team of six employees, responsible for overseeing all real property for DHS, including 54,000 different assets.

Defendant Karau was working in this capacity when his daughter, a recent college graduate at the time, left the United States to work as an *au pair* for a French family, the Madiots, living in La Clusaz, France, near the Alps, beginning in August 2018.  Anthony and Alexandra Madiot have two small children for whom the daughter was expected to care for, pursuant to a one-year contract with the family.  The beginning of their relationship was promising and the Madiots were satisfied with the daughter's efforts.  Unfortunately, as the year wore on, the relationship between the Defendant's daughter and the host family broke down due to a variety of issues, and Defendant's daughter left the Madiots' employ in late June 2019.  As her employment as the Madiots' *au pair* steadily deteriorated and upon returning home, Defendant's daughter informed her parents,

particularly her mother, co-defendant Kathleen Karau, of her experiences with the Madiots and made a series of allegations regarding their treatment of her and her living conditions while in France.[1]

Within three weeks of the daughter returning home, co-defendant Kathleen Karau decided to contact the Madiots on her daughter's behalf.  Co-defendant Kathleen Karau attempted to write the letter in the Madiots' native French and, in it, harshly criticized the Madiots' parenting methods, held them responsible for their "spoiled" and "ill-mannered" small children that the daughter at times had difficulty caring for, and levied a series of other piercing personal criticisms against Mr. and Mrs. Madiot.  *See* Gov. Ex. 1.  The letter voiced frustration about how the early termination led to them having to pay a significant fee to change the daughter's travel itinerary back to the United States, before later claiming that the Karaus had filed a formal letter of complaint against the Madiots with an unidentified subdivision of the State Department devoted to investigating claims of mistreatment of U.S. citizens while abroad.  *Id.*  For their part, the Madiots did not respond specifically to this letter, though they were somewhat concerned because the daughter mentioned to them in passing that her father was employed by the federal government and could use his influence to impact the purported "complaint" that was to be filed.

Had this missive been the culmination of the Karaus' frustration at their daughter's alleged mistreatment, the letter would have remained an unfortunate incident, but nothing more, for both families, despite co-defendant Kathleen Karau's efforts to conjure up the threat of an official "complaint."  Nevertheless, the Karau's conduct did not end with the letter.

---

[1] For their part, the Madiots, in an interview with DHS agents from the Office of the Chief Security Officer and the prior Assistant United States Attorney, denied mistreating Defendant's daughter and, while acknowledging there were issues that arose during their employment of her, were surprised given that she had previously told them she had had a positive experience overall.

Co-Defendant Kathleen Karau began drafting another letter, this time purported to be not from herself and/or her husband, but a fictional subdivision within the State Department that was carrying out an investigation into the Madiots' alleged misconduct relating to a U.S. national. A draft copy was sent from co-Defendant Kathleen Karau's personal email to Defendant Karau's government email address in late September 2019. As a forensic examination of Defendant's government computer would reveal, he later used a search engine to find the State Department's official seal to put on the letter, as well as possible statutes the letter could cite and claim the Madiots allegedly violated. After the letter was refined by the defendant's use of his government-furnished equipment and now contained the State Department's official seal, the Karaus printed it and mailed it from Washington, D.C., so that it would be postmarked where the State Department is located to add an additional layer of legitimacy to the letter.

The letter itself, *see* Gov. Ex. 2, claimed to be from a Mr. Karl Wilkinson, a Deputy Chief, from the so-called International Investigations Unit at the State Department. It stated that the Unit had received a complaint regarding mistreatment of Defendant's daughter (identified by her full legal name in the letter) and went on to say that the Unit was investigating the Madiots' potential violations of two fictitious statutes. *Id.* The letter specified that if these findings were substantiated, they would be shared with a number of other federal agencies, including the Department of Justice. It added that the Madiots were not eligible for admission into the United States under the Visa Waiver Program given that they were under investigation. Finally, the letter noted that the U.S. complainant had suffered a financial hardship due to a change in travel arrangements and that a "financial settlement would be looked upon favorably."

The letter was postmarked on October 4, 2019, and received by the Madiots shortly thereafter. The letter appears to have achieved Defendant Karau's later stated purpose of scaring

4

and intimidating the victims, as both were concerned about an ongoing criminal investigation into their conduct in which there was seemingly no available opportunity to respond to the charges against them and provide them with a chance to respond. More than that, both feared possible imprisonment, something which the references to the various government agencies in the letter exacerbated. Nevertheless, after some initial online searching, they came to believe that the so-called "International Investigations Unit" and the letter were fraudulent and they contacted the French Embassy in Washington, D.C. soon thereafter. In informing the French embassy, the Madiots noted that they had previously employed the individual listed in the letter as an *au pair* and were later able to recall that she had mentioned in passing that her father worked in the Department of Homeland Security. The Madiots were also able to provide co-Defendant Kathleen Karau's letter as well.

The following month, the French embassy in Washington contacted the U.S. Embassy in Paris, which was quickly able to confirm that the letter was fictitious for their French counterparts and initiated an investigation into Defendant Karau. The case initially went to DHS's Office of the Inspector General, which then referred it to the Special Investigations Branch of the Office of the Chief Security Officer at DHS. After that referral was made in February 2020, an initial forensic examination of Defendant Karau's computer usage revealed the aforementioned email containing a draft of the fraudulent letter sent by Defendant's wife. Agents then conducted a voluntary interview with Defendant Karau a few months thereafter, in which Defendant Karau initially pretended he did not know any "Karl Wilkinson." After the agents provided him with a further *Garrity* warning and reminded him that lying to them was a federal crime, he admitted to having reviewed the letter prior to its being sent.

The case was formally referred to the U.S. Attorney's Office for the District of Columbia after the interview in September 2020 and investigation continued.  Plea negotiations eventually followed and an agreement was reached between the parties in January 2022.  The United States filed a single count Information charging each defendant with one count of 18 U.S.C. § 712 and Defendant Karau pled guilty to that sole count.

## II.   THE APPLICATIONS GUIDELINES RANGE

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination.  *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range").  While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence. 18 U.S.C. § 3553(a)(4).

### A.   Offense Level

The relevant conduct is governed by U.S.S.G. § 2B1.1.

| USSG Section | Section | Value |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(9) | Misrepresenting of Action on Behalf of a Government Agency | +2 |
| U.S.S.G. § 2B1.1(b)(9) | Mandatory increase to level 10 | +2 |
| | | **10** |

The Government agrees that a 2-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1, resulting in an adjusted offense level of 8.

B.     <u>Criminal History Score</u>

The Defendant has a total criminal history score of zero with no juvenile or adult convictions.  PSI at ¶33.  This results in a criminal history category of I.

C.     <u>Guidelines Range</u>

The Guidelines Range for this Offense is 0 – 6 months, with a fine only, a sentence of probation (with or without a condition of community confinement or home detention), and a sentence of imprisonment, all being Guidelines-compliant.

## III.    SENTENCING RECOMMENDATION

A.     <u>Sentencing Factors</u>

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute which include the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training.  In addition, the statute requires the court to consider a number of factors in determining the appropriate sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the purposes of the statute; (3) the kinds of sentences available (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

B.     <u>Allocution</u>

The Defendant abused his position of authority within one of the U.S. government's most sensitive agencies to frighten, intimidate, and extort a French family who he believed had wronged his family.  Putting aside the veracity of the allegations – which remains in dispute – the notion that a senior government official with three decades of experience in federal service would resort to conjuring up a threatening letter on what purported to be official government stationary to settle a personal score simply beggars belief.  Indeed, the offense did not consist of one rash moment in which Defendant Karau acted on impulse.  Rather, the conduct had its roots months before the letter was mailed and despite several opportunities to cease in this course of conduct, at each critical moment, Defendant Karau persisted.  It began with the private letter authored by co-defendant Kathleen Karau to the Madiot family, threatening them with a complaint filed to a fictitious government agency.  Instead of working together with his wife to defuse the situation with the Madiots or pursue appropriate means of redress for their personal grievances, the Karaus doubled down.  Defendant Karau received the email containing the draft letter and instead of deleting it or counseling his wife that this was not appropriate, he edited it, put a State Department seal on it, conducted legal research and referenced language apparently taken from criminal statutes in the letter, and leveraged his own expertise by referencing the VWP.  Yet even at that point, there was another opportunity to end this conduct by simply throwing the fraudulent letter in the trash and moving on from the unfortunate situation.  Nevertheless, Defendant Karau joined his wife and went into D.C. to mail the letter to give the letter an imprimatur given that it would have been postmarked from the same city as the State Department's headquarters.  In sum, everything in Defendant Karau's long tenure within the federal government – resulting in him reaching a GS-15 level of compensation and TS/SCI – should have counseled against him abusing his office in this way.

8

Yet not only did Defendant's conduct represent an abuse of his official position by using his government-furnished equipment to facilitate the personal grudge, it also had real, tangible impacts on a number of individuals, namely the Madiots.  The Madiots, a couple from rural southeastern France, were faced with what purported to be an official letter, with a formal seal, from a sensitive-sounding subdivision within the State Department, that was replete with serious accusations, references to language from criminal statutes, threats of being barred from entry into the United States, and enticement to pay a financial settlement to make it all go away.  As the Madiots themselves described it in the interview, they were frightened and concerned of what individuals would believe about them without any opportunity for them to defend themselves and what was going to happen to them.  Fortunately, they alerted the relevant authorities in the French embassy, who then notified their U.S.-counterparts in Paris, and an investigation was initiated.  Unfortunately, the end result of that investigation was having to explain to the Madiots and their government how it was that a senior, high-ranking individual in DHS with decades of experience came to create a fraudulent letter from a fictitious government agency to intimidate them.

Balanced against the severity of this offense and its impact is the fact that Defendant Karau has no criminal convictions, but rather a long record of service to the federal government.  Indeed, the government does not believe that the public needs to be protected from the Defendant or that the Defendant needs to be further deterred.  Defendant had a stable, established, high-ranking position at a premier government agency that he has lost along with the ability to leverage his government experience in the private sector by virtue of this guilty plea.  Defendant has already paid a significant price for his crime in the form of financial instability and personal embarrassment for his conduct which the government believes will deter him going forward.  As such, no period of incarceration or home confinement is necessary, and the government believes that the Court can

accomplish all of the objectives of 18 U.S.C. § 3553(a) by imposing a suspended sentence.

IV.    **CONCLUSION**

Consequently, the government, consistent with the agreement it reached with the defendant, will be requesting a period of unsupervised probation for 12 months.

**CONCLUSION**

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____/s/*Will  Hart*_
WILL HART
Assistant United States Attorney
Federal Major Crimes Section
D.C. Bar No. 1029325
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone No. (202) 730-5711
William.hart@usdoj.gov